[No. 26830.   Department Two.   January 6, 1938.]

JOHN ANDREWS et al., Appellants, v. W. STARK et al., Respondents.[1]

*DuPuis & Ferguson* and *Ernest R. Wilkins,* for appellants.

*Davis, Heil & Davis (Harold W. Coffin,* of counsel), *Danson, Lowe & Danson,* and *Justin C. Maloney,* for respondents.

[1]Reported in 74 P. (2d) 999.

ROBINSON, J.—This case was tried by the court without a jury. Although there were additional parties named in the pleadings, the actual contest was between the plaintiffs, John Andrews, his brother Alfred Andrews and Mollie Andrews, his wife, and the defendants and cross-complainants Robert L. Harris and W. Stark and wife. The contentions presented on appeal have required us to examine and analyze the exhibits and the transcribed testimony of thirty-four witnesses in order to determine the facts, which are complicated, involving, as they do, collisions in which four automobiles participated and in which seventeen persons as drivers or passengers were concerned. All of the plaintiffs, and particularly Alfred Andrews, received severe injuries. They sued for recovery in the total sum of approximately $28,000. Harris counterclaimed for $2,500, and Stark and wife for $550.

The material facts, as we determine them from the record, are, in substance, as follows: At about one a. m. on November 1, 1936, Harris, a salesman employed by a laundry supply house, was driving into Spokane on Division street. The car was a 1929 Ford coach belonging to his employer. With him were Howard Davis, a laundryman of Sand Point, Idaho, Mrs. Davis, a Miss Cunningham, Miss Goldsmith, and another man, a cousin of Miss Goldsmith's, whose name does not appear. The party had left rather late to go to a dance near Colbert.

They did not find the dance, and, while on their way back to Spokane and within a mile and a half or two miles from the city limits, they heard a "growling" noise which seemed to come from the rear of the car. It was not continuous, but stopped and recurred at intervals. The growling did not interfere with the operation or speed of the car. Mr. Davis ventured the opinion at the time that it was probably

caused by the lack of grease in the differential. Suddenly, as Harris, Davis, Mrs. Davis, and Miss Goldsmith all testified, there was a loud "clunking" noise and the car stopped dead.

Upon an examination, it appeared that the rear wheels had suddenly locked and would not revolve. Mr. Harris tried to jar them loose by putting the car in reverse. The men got out and rocked the car, and they tried to push or pull it off the road, all without result. A friend of Mr. Davis had offered him the use of his car and given him the key. He caught a ride into Spokane to get it. Miss Goldsmith, who worked for the same company that Mr. Harris did, went to a phone and called a garage, which serviced the company's cars, to send out a wrecker.

It is important to note the car's exact position. Several witnesses testified that it was at the very edge of the pavement when it stopped. Others say that a little later on it was even a foot or so off the pavement. It was in front of a gas station and about seventy-five feet from the north line of Francis avenue, which street crosses Division at right angles and marks the north city limits of Spokane. Just across Francis avenue and on the same side of the street was a Shell gas station, and just beyond that Bonney's Inn. A large number of people were dancing and dining there, and their cars were parked all around the inn and the Shell station.

Behind the Harris car, the wide, four-lane street stretched straight and nearly level on a very slight, ascending grade for about a mile and a half, where it dipped down a small hill. If Harris stopped to consider whether or not his car constituted a danger to traffic, he was entitled to note that the street lights which began on the south side of Francis avenue gave warning to persons coming from behind him that they

were approaching the city limits; that his car was at the extreme right edge of a four-lane highway more than forty feet in width; that its tail light was burning; that behind it about 225 feet there was a large oblong sign, 18 by 36 inches, reading, "Spokane City Limits," the word "Spokane" being spelled out in cat's-eye reflector buttons, and that behind that about 150 feet was a big diamond shaped regulation highway "Slow" sign, with a large red bull's-eye reflector directly beneath it. On the other hand, there was, and had been, some precipitation. The surface of the street was darkened, because wet, and visibility was poor.

After Miss Goldsmith returned from calling the wrecker, the members of the party, except Mr. Davis, who had gone to get his friend's car, stood between the car and the gas station. It was cold, and someone suggested getting into the car. There was considerable traffic coming from the north, and Miss Goldsmith's cousin thought it not a good idea on that account, but, trusting to the tail light on the car to protect them, they got in. In a few minutes, a car driven by Mr. Meechan came up behind from the north and collided with the rear of the Harris car.

In the meantime, and just before that collision, ·Clarence D. Adams had driven up en route to Bonney's Inn, and had parked near the gas station over across Francis avenue. He heard the collision, took his flashlight, and went over. Mr. Adams was a member of the Junior Chamber of Commerce, which for sometime had been earnestly engaged in a campaign to prevent traffic accidents. In this campaign, Mr. Adams had taken an active part. After learning that no one was seriously injured in the Harris car, he helped Mr. Meechan get his car off the road. He said the tail light on the Harris car was still burning, and he could see that the collision had shoved it off the pavement,

perhaps the width of a fender. Meechan came back after parking his car, and, according to his testimony, Miss Goldsmith then led him around behind the back of the Harris car and called his attention to the fact that the tail light was still burning. It was inadvertently brought out by the plaintiffs in examining Mr. Meechan that Mr. Meechan later paid for the damage he did to the Harris car.

The collision attracted the attention of other car owners who were parked in the neighborhood of the Shell station across Francis avenue, with the result that several of them turned on their lights and left them shining on the Harris car from various angles. Adams took his flashlight and went back up the road to flag down approaching cars. He says, as he stood there doing so, he occasionally played his light across the street, and that he was right opposite the north wing of a new cabin camp which had just been constructed there. This, as exhibit 1 shows, was a good three hundred feet back of the stalled car. Standing astride the yellow line when a car approached from the north, Adams swung the light horizontally across the road at about the height of the windshield. There was a great deal of traffic into Spokane, apparently from Wandermere, a popular dinner and dance resort about six miles out, which closes at one a. m. In this way, according to his own evidence, which is corroborated by a number of other witnesses, Adams flagged down twenty or more cars. None of them disregarded his signals. Some of them stopped, and others merely slowed down and proceeded carefully.

Finally, along came Mr. Stark, driving a Buick coupe. He, with a large party of friends, had dined and danced at the Elks Club. They had all agreed to meet at the home of one of their number in the north end, somewhere near the intersection of Division street

and Francis avenue. Through a mistake, Stark was assigned too great a proportion of the party, and, counting himself, there were five people in his Buick coupe. He had driven too far out on Division street and was returning when he was flagged down by Mr. Aadms. He stopped, as he and several members of his party testified, and was told that there was a stalled car ahead. He drove slowly down the right-hand lane. As he approached the stalled car, some of the bystanders came up to meet him and asked him to push it off the street. He agreed to do so and began moving slowly up behind it to make contact.

As Stark left Adams and moved slowly down the street, another car showed up over the rise coming south. Adams testified that he stood on the yellow line marking the center of the south-bound track. He began swinging his flashlight, but the car came down the middle of the west lanes right over the yellow line and so fast that he was nearly run down. Adams testified that he felt sure that there would be a collision, as the car was traveling not less than forty-five miles per hour, and, perhaps, as much as fifty-five. He started to run down the street. Due to the lights that were playing on the stalled car from the south and the lights of the car coming from the north, he saw the collision plainly. He said that the car which passed him so rapidly veered even more to the west, and that, had it continued its course, would have entirely missed Stark's car and the stalled car ahead of it, but that it swerved again in the opposite direction and struck the Stark car on the left corner; that that car seemed to bound in the air and the colliding car seemed to explode, the doors flying open and people falling out.

Mrs. Davis and Miss Goldsmith, who stood in front of the gas station to the right of the Harris car, testi-

fied that a car, which afterwards proved to be the Stark car, came slowly down the road, and some of the bystanders went back to meet it. One or two of them walked beside it as it advanced, while another man ran ahead and told Harris that a man was coming to push him off the road and to get in his car and steer it. Harris was just getting into the driver's seat, and the Stark car was about three feet directly behind, and in line with it, slowly creeping up, when the Andrews car came along at a high rate of speed and struck the Stark car with a terrific crash.

John and Alfred Andrews had come to Spokane from Withrow, via Coulee City, the previous afternoon. Mrs. Alfred Andrews was already in Spokane. They met her at the apartment of Miss Fisher, a friend of John Andrews, about eight-thirty. Several other friends arrived an hour or two later, and they all drove out to Wandermere. They left Wandermere about one o'clock, John Andrews driving. Miss Fisher was in the front seat with him. The car was a 1936 Ford sedan, which had been driven about ten thousand miles.

In his accident report made on November 2, John Andrews stated that he was driving "40 or 45 miles per hour." He appears to have been a frank and candid witness. Concerning his speed, he testified, on his direct examination:

"I couldn't say right to the mile how fast I was going. I presume it was around 40. It might have been a little more or a little under."

With reference to his lights, he said:

"I couldn't say that they were exceptionally good, but they were average lights,"

and with respect to his brakes, he testified:

"Oh, they were good. They were not too good. They were average brakes."

He insisted that at a speed of forty miles per hour it would take him more than one hundred feet to stop his car, and in the next breath testified that the weather conditions were such that he could not see more than seventy feet ahead, and he was traveling on an unfamiliar road. He further testified that he did not note from the city lights that he was approaching the city limits; that he did not see the "Slow" sign; that he did not see Adams' flashlight; that he did not see the cat's-eye "Spokane City Limits" sign; that he did not see the tail lights of any automobiles, but that he saw the loom of a car when he was, perhaps, sixty or seventy feet from it and tried to avoid the collision by putting on his brakes and swinging sharply to the left. He thought the car stood at an angle, with one rear wheel over the yellow line. He struck it an angling blow on the left rear corner.

Miss Fisher described the accident as follows:

"A. Well, we were driving along and we were talking about coming to town to eat, and we were driving along and I judge it was about—I wouldn't say the speed, 35, 40 or 45 maybe, and it was snowing, and all of a sudden,—Oh, 15 or 20 yards ahead of us I saw a black object. It just came all of a sudden. I put my feet up like you would do if you were driving a car,— and I have driven quite a while. I put my feet up and he turned. He put his foot on the brake and I think I screamed. Q. Which way did he turn? A. He turned east, to the left. Q. Do you have an idea about how far north you were from the point where the collision occured when you saw this car? A. Oh, fifteen or twenty yards. Q. What was the position of this car on the highway, if you know? Tell us something about that. A. Just at a glance, it was at an angle. Just a glance. Q. You just got a flash of it? A. Yes."

Sergeant Pryde and Officer Coshaw, of the state patrol, arrived from the north a few minutes after the

accident. They were flagged down by Adams as they came up. The injured had been carried to the roadside. Harris, Alfred Andrews, and Mrs. Andrews were unconscious, and John Andrews was wandering about in a dazed condition. Sergeant Pryde said the visibility was cut down by the weather conditions, but, as they came down the road, they could see ahead probably 150 feet. The officers asked Adams to continue with his flashlight. They did not consider it necessary to put out flares. Sergeant Pryde drew a diagram showing that the Stark car was standing slightly at an angle after the collision, with its rear end projecting into the road.

While the foregoing account does not by any means state all the evidence in the case, it fairly well covers the salient points, and fully supports the findings made by the court. In fact, there is no substantial conflict in the evidence. Such as there is relates to the Stark car. So many witnesses testified—Stark himself, some of his passengers, and Mrs. Davis, Miss Goldsmith, and Adams, none of whom knew Stark—that he came up slowly and directly behind the Harris car, which is, of course, the natural way in which a car intending to push another by bumper contact would come up, that we are satisfied that this account of the matter is correct. John Andrews and Miss Fisher testified from only a fleeting glance. One would expect the cars to stand at an angle after the collision if Andrews, as he says, swerved his car to the left. In such case, his car would strike the left rear of the Stark car at an angle and tend to slew its rear end around.

The trial court concluded that no negligence was shown on the part of Stark or Harris, but that the proximate cause of the accident was the reckless and careless driving of John Andrews. The appellant con-

tends that these conclusions are erroneous in every particular.

In our opinion, there is no evidence whatever tending to show negligence on the part of Stark. As to Harris, two contentions are made; first, that he was negligent in that he did not take proper precautions to warn other drivers after his car was stalled in the road, and second, that he was negligent in not getting entirely off the road when his car made the growling noises.

As to the first contention, while it is true that Harris does not seem to have personally performed any specific acts in the way of warning other cars, these acts were performed by others in his presence and with his knowledge. Miss Goldsmith, of his office staff, sent for a wrecker, even before the first collision, and after the first collision a number of people came over from Bonney's Inn and took charge of the situation. After a discussion of the matter, some of them agreed to, and did, turn their lights on the stalled car, and Adams went up the road with his flashlight. Furthermore, the tail light on the Harris car was burning, and he was in a protected situation, being below both the "Slow" and the "Spokane City Limits" signs.

We are not able to say that insufficient care was taken under the circumstances. It was not a lack of signs and warnings that was responsible for the collision, but John Andrews' inexcusable failure to see or take note of a single one of them.

The appellants, however, make their strongest stand upon the contention that Harris was negligent in not driving the car off the road when the growling noises persisted. In this connection, there is proof that he might easily have done so, for at points along his course, and especially for several hundred feet just

before the car stalled, there was level ground adjoining, with no intervening ditch.

We have carefully examined the evidence of the four witnesses, Harris, Davis, and his wife, and Miss Goldsmith. It appears from their testimony that the growling was not very loud; that it was intermittent; that they were not more than two miles from Spokane when it began; that Davis thought it was caused by a lack of sufficient grease in the rear end, and said so at the time; that it did not interfere with the progress of the car, and it did not occur to anyone that it might. Harris said he had driven cars which had made the same noise before, some of them continuously. It was shown that the car had been kept in good mechanical condition and serviced regularly. Two and one-half pounds of grease had been packed in the transmission and differential on October 4, a little less than one month before the accident.

We cannot assume that a growling noise, such as was described by the witnesses, constituted a warning that the wheels were about to lock and that the car was about to cease functioning. Automobiles are, and for a long time have been, in such wide and general use that, if that is true, there must be many automobile mechanics and garagemen who know it. Yet none was called to so testify. We agree with the trial court that no actionable negligence was shown in this respect.

It is not contended that the amounts awarded to Stark and Harris were excessive. As judgment was entered against John Andrews only and we have come to the conclusion that Harris and Stark were free from liability, the question as to whether the occupants of the Andrews car were engaged in a joint adventure, as found by the trial court, does not become material,

and we, therefore, express no opinion as to that finding.

The judgment, as entered by the trial court, is affirmed.

STEINERT, C. J., BEALS, BLAKE, and SIMPSON, JJ., concur.